No. 19,238.

THE STATE OF KANSAS, ex rel. ETHEL BEASON, etc.,
*Appellee,* v. WILLIAM W. LAW, *Appellant.*

### SYLLABUS BY THE COURT.

1. ILLEGITIMATE CHILD — *Paternity of Child — Evidence Sufficient to Uphold the Verdict.* In a proceeding to determine the paternity of a child and to provide for its maintenance and education, where the relatrix claimed and testified that a child born to her, which was about the weight and size of one born at the end of the ordinary period of gestation but which bore some evidences of prematurity, was begotten two hundred and seventeen days before its birth, it can not be held that her claim is an impossibility under the laws of nature, and, further, it is held that the testimony in the case was sufficient to uphold the verdict that was rendered.

2. SAME—*Civil Action—Preponderance of Evidence Only Required.* The proceeding is essentially a civil one in which the rules of evidence are to be applied the same as in civil cases, and hence no more than a preponderance of the testimony is required to establish contested facts.

3. SAME—*Failure to Call Certain Persons as Witnesses—Not Material.* The trial court would not have been warranted in telling the jury that the failure of one party to call a certain person as a witness warranted the inference that his testimony, if produced, would have been unfavorable to such party, since the testimony was equally available to both parties and there were satisfactory reasons for not calling the person to testify.

4. —— *Instructions—Passing Upon Credibility of Witness.* No error was committed in the giving of an instruction to the effect that in passing upon the credibility of witnesses and in considering and measuring the testimony in the case the jury might use such knowledge as they possessed in common with men in general.

Appeal from Marshall district court; SAM KIMBLE, judge. Opinion filed November 14, 1914. Affirmed.

*Robert L. Helvering,* of Marysville, *A. E. Crane,* of Atchison, *F. T. Woodburn,* and *E. D. Woodburn,* both of Holton, for the appellant.

*Charles H. Davis,* of Marysville, *E. A. Berry,* of Waterville, *W. J. Gregg,* and *J. D. Gregg,* both of Frankfort, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This is a proceeding to establish the paternity of the bastard child born to relatrix, an unmarried woman about sixteen years of age, and to provide for the maintenance of the child. William W. Law was adjudged to be the father of the child, and required to pay certain sums of money at fixed times for its maintenance and education. The relatrix testified that appellant came to her father's home on the farm on January 7, 1909, when all of the family except herself were absent, and that when she rejected his proposal to have sexual intercourse he seized and threw her to the floor and accomplished his purpose. The appellant was a neighbor of the Beasons, and was about forty-five years of age at the time mentioned. He was a widower and had six children, one of whom was being cared for in the Beason home. The relatrix did not tell any one of the assault made upon her until in May, 1909, when she was taken by her mother to a physician for examination and treatment. The doctor, who was a brother of the appellant, discovered and stated that she was in a state of pregnancy, and to an inquiry as to who was responsible for her condition she told the doctor that his brother, the appellant, was the one. The child was born on August 12, 1909, and according to the testimony of the relatrix that was just two hundred and seventeen days after the alleged act of intercourse with appellant.

The principal complaint on this appeal is that the verdict of the jury is not sustained by the evidence. It is contended by the appellant that as the child weighed eight pounds, was from eighteen to nineteen inches in length, and developed normally and steadily after birth, that conception could not have taken place

at the time named by the relatrix. There was testimony of the relatrix that the appellant was the only person who ever had such relations with her. While appellant denied the alleged intercourse and also her statement that he had visited the Beason home on the day named, there was confirmatory testimony given by other witnesses to the effect that he was seen approaching the Beason home about the time mentioned, and further that he had asked a neighbor near the same time for his opinion as to the chastity of Ethel Beason and her sister, and inquired if he did not "think a fellow could get next to them pretty easy."

It is urged that a child born on August 12 of the length, weight, strength and development of the one in question could not, under the laws of nature, have been conceived on January 7. It is further said that the morning sickness, or the vomiting of pregnancy, which relatrix testified occurred four days after the alleged intercourse, shows that her statement as to the intercourse is unreliable. While the child was healthy and about the weight and length of one of full development, there were some evidences of prematurity. Physicians who examined the child the day of birth said that the bones of the head lacked in ordinary ossification, the fontanels were wide, the sutures open, there were fine pimples on the nose and cheeks, and lanugo, or fine, downy hair, over the back, shoulders and breast, there was an absence of eyebrows, with only soft eyelashes, and the nails had not grown out to the ends of the fingers. It is true that some of the doctors who saw the child shortly after birth testified that, notwithstanding these evidences of prematurity, the period of gestation could not have been less than thirty-six weeks and that the child could not have been begotten on January 7, 1909. However, the physician who attended the relatrix testified that the child bore marked evidences of prematurity and that the period of gestation must have been less than thirty-six weeks. Taking January 7 as

the time of conception the period of gestation was thirty-one weeks or seven and three-fourths lunar months. From the testimony and authorities it can not be said that the finding that the child was begotten at the time stated overturns physical law nor that the claim made by the relatrix is an impossibility. All know that the laws of nature as to the period of gestation are not immutable. The testimony in the case and the information to be derived from the authorities, which we may consider, show that many influences affect the duration of pregnancy as well as the development of the child and that nature does not always act with uniformity. For instance, 3 Wharton & Stillé's Medical Jurisprudence, p. 39, after referring to many instances, concludes that while the average period of gestation is about two hundred and seventy-five days from the end of the last menses there are many variations, and that the period has been known to be protracted to three hundred and forty-four days, and mentions a case of the shortest recorded pregnancy where the child was born in the eighteenth week, one hundred and twenty-six days, and where it lived for more than eight years. In Williams on Obstetrics, Appletons' New Medical Series, it is said that ordinarily the approximate duration of pregnancy is about two hundred and seventy days, but that individual cases in a series of four hundred and twenty-five presented marked differences ranging from two hundred and thirty-one to three hundred and twenty-nine days. The general rule, it is said, "is subject to many exceptions, as apparently well-developed children may be born as early as the two hundred and fortieth, and as late as the three hundred and twentieth day after the last menstrual period, and there is no doubt that in exceptional instances the actual duration of pregnancy may equal, if not exceed, three hundred days." (p. 170.)

According to the testimony of relatrix her last menstrual period was on December 12, which would be two hundred and forty-three days before the child was born.

In Emerson on Legal Medicine and Toxicology it is said that children born at the seventh month of gestation are capable of living, but generally are more delicate and require greater care and attention than children born at the full term, and, further, that:

"It may be considered that children born at the seventh or even about the sixth month may be reared, and that their survival cannot in any way be taken as proof of their illegitimacy. The development and condition of the child is of far more importance in forming an opinion than is the mere period of gestation." (p. 139.)

Volume 2 of Witthaus & Becker on Medical Jurisprudence, p. 525, is to the same effect.

In treating on this question in Garrigues, A Textbook of Obstetrics, it is said that:

"Based on large statistics the supposition is warranted that in woman the time varies between two hundred and twenty and three hundred and twenty days, counting from the fecundating intercourse." (p. 52.)

In volume 1 of Taylor's Principles and Practice of Medical Jurisprudence, 6th ed., after giving the averages of the characteristics of a child at the different stages of gestation, it is said:

"They are, it is well known, open to numerous exceptions, for some children at the ninth month are but little more developed than others at the seventh; and in some cases a seven months child cannot be distinguished with certainty from a nine months child." (p. 196.)

In Rodgers on Domestic Relations it is said that:

"Children born before the full time 'differ in size, general appearance, apparent maturity, etc.' And the fact, therefore, that a child is born within seven or eight months does not show illegitimacy for this reason. It is a fact gleaned from the field of medical jurisprudence that children born within eight months after conception have been known to be larger and healthier than those born at nine. It is not safe, therefore, to

place too much importance in the size or appearance of a child so born. It is a fact, furthermore, that there is a disposition in some females to expel the child before the ordinary term. This occurs sometimes as soon as the seventh month." (p. 563.)

While the time falls considerably short of the ordinary period of gestation, and while the child was about the weight and size of a full-term child, and while there is evidence strongly conflicting with the claims of relatrix, we can not, in view of the considerations stated and the testimony in favor of the relatrix, hold that her claim is an impossibility under the laws of nature, or that the verdict is without support.

Although the proceeding is criminal in form, it is essentially civil, and the rules of evidence are to be applied the same as in civil cases. (Gen. Stat. 1909, § 4026.) Like other civil cases a preponderance of the evidence is sufficient to establish the contested facts, and while there is a conflict of evidence the finding of the jury determines the issue of paternity.

Some time after the case had been submitted to the jury they returned with the inquiry:

"Did the defense have a right to put Harry Stansel on the witness stand?"

In answer to this question the court said:

"Both the State and the defendant had the right to put Stansel on the stand if either wished, but the jury should not consider such matter at all, and apply yourselves to the evidence actually given."

The appellant insists that as Stansel had been an employee of Beason and a friend of the family, and, further, that as appellant had claimed that Stansel had frequently been in the company of relatrix and was in fact the father of the child, the failure to call him, without satisfactory reasons, warranted the inference by the jury that his testmony, if it had been produced, would have been unfavorable to relatrix. It can not be said that appellee did not have reasons for

The State, *ex rel.*, v. Law.

omitting to call Stansel as a witness. While he had been an employee on the Beason farm and was apparently on friendly relations with the family, he had also been in correspondence with an uncle of appellant since this proceeding had been begun, and had proposed to aid the uncle's friend by giving information and carrying out a certain plan that he suggested would be very helpful to that friend. Under the circumstances it is not easy to say that the bias of Stansel was in favor of the appellee. He was near the court during the trial, and his testimony was as available to one party as to the other. The rule invoked, that the party who is in control of testimony that is an essential part of the case, and does not produce it without satisfactory reasons for his action, justifies the inference and warrants the presumption that the evidence would have been unfavorable to the claims of the party, was not applicable in this case. The court correctly ruled that the jury should confine their considerations to the evidence produced in the case rather than to some that they might think should have been produced.

We see no error in the instruction which advised the jury that in passing upon the credibility of witnesses or in measuring the evidence they could use the knowledge and experience they had in common with men in general. It was an appropriate admonition in a case like this one. The jury could not have understood that the court referred to their knowledge of the particular case or to any special facts in the case, nor that their knowledge might be substituted for evidence, but rather that they should apply their general knowledge and experience, such as they possessed in common with the rest of mankind, in considering and measuring the testimony actually produced before them. No error, we think, could have resulted from the instruction.

The judgment of the district court will be affirmed.